**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| J.S. and M.S., *on behalf of themselves and all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>MEMORIAL HERMANN HEALTH SYSTEM,<br><br>Defendant. | **Case No.**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiffs J.S. and M.S. (collectively, "Plaintiffs") bring this class action lawsuit on behalf of themselves and all others similarly situated, by and through undersigned counsel, and hereby allege the following against Defendant Memorial Hermann Health System ("Defendant" or "Memorial Hermann"). Facts pertaining to Plaintiffs and their experiences and circumstances are alleged based upon personal knowledge, and all other facts alleged herein are based upon investigation of counsel and—where indicated—upon information and good faith belief.

**INTRODUCTION**

1. This class action lawsuit arises out of Memorial Hermann's unlawful use of third-party tracking technologies by advertising giants such as Google LLC ("Google") to surreptitiously intercept and disclose its users' private and protected communications, including communications concerning highly sensitive personal health information, to third parties without users' knowledge or consent.

2. Memorial Hermann operates, controls, and manages hospitals, clinics, and specialty practices throughout the Greater Houston area.[1]

3. Memorial Hermann also operates, controls, and maintains the website www.memorialhermann.org and its webpages, including the online scheduling service at www.scheduling.memorialhermann.org (collectively, the "Website"), which Memorial Hermann encourages patients and prospective patients to use to, among other things, (i) book appointments, (ii) locate medical providers and clinics, and (iii) communicate information about their medical conditions and the care Memorial Hermann offers.[2]

4. However, unbeknownst to patients who visited Memorial Hermann's Website, their communications about their health care were intercepted and disclosed to third parties through Memorial Hermann's use of third-party tracking technologies ("Tracking Tools").

5. By intentionally embedding and deploying third-party tracking technologies on the Website, Memorial Hermann engages in the unauthorized disclosure of its users' highly sensitive protected health information ("PHI") and personally identifiable information ("PII" and, together with PHI, "Sensitive Health Information") to third parties, including Google. Such disclosures of PHI and PII violate state and federal law.

6. The Tracking Tools embedded on Memorial Hermann's Website secretly intercepted, acquired, and transmitted Plaintiffs' and Class Members' private electronic communications and Sensitive Health Information to unauthorized third parties, including Google, without their knowledge, authorization, or consent. These disclosures included, among other

---

[1] See Memorial Hermann, About Our Organization, https://memorialhermann.org/about-us/about-our-organization (last visited Nov. 9, 2026).

[2] See Memorial Hermann, ScheduleNow, https://memorialhermann.org/schedule-online (last visited Nov. 9, 2026).

things: (i) their status as patients of Memorial Hermann; (ii) their existing medical conditions, diagnoses, and health concerns; (iii) the symptoms, illnesses, and medical conditions they researched; (iv) the specific medical services, procedures, examinations, tests, and treatments they sought or considered; (v) the medical specialties, physicians, and other healthcare providers they researched, selected, or sought appointments with; (vi) the hospitals, clinics, and other locations where they sought or received medical care; (vii) their searches for physicians, medical facilities, and available appointments; (viii) their selection and scheduling of medical appointments, including the physician, specialty, type of consultation or procedure, facility, appointment date, and appointment time; (ix) their interactions with online scheduling forms, including the selection of appointment slots and completion of booking-related steps; (x) their requests to pay medical bills or obtain medical records; and (xi) the webpages, links, and other Website features they accessed in connection with researching, obtaining, or managing their medical care. Memorial Hermann transmitted this information together with identifying information. The information transmitted was not merely anonymous website traffic or generalized browsing statistics, but the substance of users' private communications concerning their medical conditions, healthcare needs, selection of medical providers, and efforts to obtain treatment, accompanied by identifiers identifying those communications with particular users.

7. Health information is highly regulated by both state and federal law, including HIPAA, which imposes criminal penalties for knowingly disclosing, in violation of HIPAA, individually identifiable health information ("IIHI") to a third party, which includes information that "is created or received by a health care provider" and "relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual[.]"

Accordingly, Memorial Hermann's disclosure of Plaintiffs' and each Class Member's Sensitive Health Information is alleged to violate HIPAA to the extent it involved individually identifiable health information disclosed without authorization or another lawful basis.

8. Memorial Hermann installed the Tracking Tools with the purpose of intercepting patients' Sensitive Health Information in transmission and then disclosing that information to third parties, including Google, in violation of the statutory and common-law duties alleged herein.

9. Plaintiffs and Class Members never consented to, authorized, or otherwise agreed to allow Memorial Hermann to disclose their PHI and PII to third parties. Despite this, Memorial Hermann knowingly and intentionally disclosed Plaintiffs' and each Class Member's PHI and PII to Google and other third parties.

10. Given the nature of Google's business as one of the world's largest online advertising companies, Plaintiffs' and Class Members' Sensitive Health Information can be used for advertising.

11. But, in exchange for access to Google's Business Tools, website operators install Tracking Tools, including pixels and cookies that capture sensitive information supplied by website users. Those tools can transmit both the substance of a user's communications and persistent advertising identifiers that allow Google to recognize the browser and associate events across visits, together with the specific pages, medical services, and providers selected.

12. When a medical provider uses Google's advertising tools, its configuration can cause patients' medical communications to be transmitted directly to Google together with identifiers that Google uses to recognize and correlate browser activity. On information and belief, Google's existing advertising and account-related information can enable it to associate those communications with a particular user, even where a request does not contain the patient's name.

13. Google offers its patients' website operators access to its proprietary suites of marketing, advertising, and customer analytics software, including Google Analytics, Google AdSense, and Google Tag Manager (collectively, the "Business Tools"). While Google offers these Business Tools to its clients, those clients are the ones that install and specifically configure those tools, including the Tracking Tools at issue here.

14. Armed with Google's Business Tools, website operators can leverage Google's enormous database of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

15. But, in exchange for access to Google's Business Tools, website operators install Tracking Tools, i.e., Google's surveillance software, on their website, including tracking pixels ("Pixels") and third-party cookies that capture Sensitive Health Information provided to the website operator by its website users. This sensitive information can include identifiers associated with a user's browser or device. The Tracking Tools can also capture and share other information like the specific webpages visited by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer.

16. In essence, when website operators use Google's Business Tools, they choose to participate in Google's mass surveillance network and, in turn, benefit from Google's collection of user data at the expense of their website users' privacy by allowing Google to use that Sensitive Health Information to send personalized advertisements to its patients based on that Sensitive Health Information.

17. Memorial Hermann is one of the companies that has chosen to prioritize its marketing efforts and profits over the privacy of its users and potential patients by installing

Google's Tracking Tools on its Website with the purpose of intercepting and then disclosing its users' Sensitive Health Information. Memorial Hermann intentionally installed the Tracking Tools on its Website and configured the Tracking Tools to unlawfully intercept and disclose its users' Sensitive Health Information to Google.

18. However, Memorial Hermann never obtained authorization from Plaintiffs or Class Members to share their Sensitive Health Information with third parties. At all times relevant to this action, Plaintiffs and Class Members gave no informed consent for information about their Sensitive Health Information to be transmitted to third parties, including Google.

19. As a result of Memorial Hermann's conduct, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of medical privacy; (ii) lack of trust in communicating with medical providers; (iii) emotional distress and heightened concerns related to the release of Sensitive Health Information to third parties, (iv) loss of benefit of the bargain; (v) diminution of value of the Sensitive Health Information; (vi) statutory damages; and (vii) continued and ongoing risk to their Sensitive Health Information.

20. Therefore, Plaintiffs seek, on behalf of themselves and a class of similarly situated persons, to remedy these harms and assert the following statutory and common law claims against Memorial Hermann: (i) violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511 et seq., (ii) violation of the Texas Wiretap Act, Tex. Code Crim. Proc. art. 18A.502 and Tex. Penal Code § 16.02, (iii) negligence, (iv) unjust enrichment, (v) breach of implied contract, and (vi) unauthorized disclosure of hospital health care information, Tex. Health & Safety Code §§ 241.151(2), 241.152–.153, and 241.156.

## PARTIES

***Plaintiff J.S.***

21. Plaintiff J.S. resides in Houston, Harris County, Texas, and brings this action both in an individual capacity and on behalf of all others similarly situated.

22. Plaintiff J.S. utilized the Website on his personal electronic devices to research his symptoms, select a provider, and make appointments related to his medical care. Among his interactions with the Website, Plaintiff J.S. searched for doctors and locations, reviewed the locations and availability of Dr. Olubayo Tojuola and used the Website to schedule an in-person urology appointment for November 11, 2026, at 1:30 p.m. at Memorial Hermann Medical Group Greater Heights Urology, 1631 North Loop West, Suite 500, Houston, Texas 77008. Plaintiff J.S. received a text message confirming the appointment and directing him to complete forms through the My Memorial Hermann app.

23. Unbeknownst to Plaintiff J.S., on information and belief, Memorial Hermann intercepted the Sensitive Health Information that he communicated in transit while using the Website, including the fact that he scheduled an appointment with a urologist at a particular Memorial Hermann location. Memorial Hermann then transmitted this information to third parties, including Google. Among the Sensitive Health Information that Plaintiff J.S. disclosed to Memorial Hermann and that Memorial Hermann allegedly disclosed to Google were: (i) his status as a patient; (ii) his searches for information related to medical care for which he sought treatment; (iii) the fact that he was seeking care from a urologist; (iv) that he scheduled a medical appointment with his selected provider; (v) the identity of that provider and their medical specialty; and (vi) the location, date, and time of his appointment.

24. As a result of Plaintiff J.S.'s use of the Website, Memorial Hermann disclosed the information he shared through the Website to third parties, including Google. Defendant also

disclosed to third parties Plaintiff J.S.'s PII, including the disclosure of identifiers, like the CID and AUID, that allowed Google to personally identify him.

25. Plaintiff J.S. never authorized Memorial Hermann to disclose any aspect of his communications with Memorial Hermann through the Website to third parties, including the Sensitive Health Information that he provided to Memorial Hermann. He expected that information to remain confidential.

26. On every occasion that he visited the Website, Plaintiff J.S. possessed an account with Google, and he accessed the Website while logged into his Google account on the same device.

***Plaintiff M.S.***

27. Plaintiff M.S. resides in Houston, Harris County, Texas, and brings this action both in an individual capacity and on behalf of all others similarly situated.

28. Plaintiff M.S. utilized the Website to research her symptoms, select her medical providers, schedule appointments related to her medical care, and review her test results. Among her interactions with the Website, Plaintiff M.S. searched for and researched information related to Dr. Atilla Ertan and scheduled an in-person appointment for a colonoscopy at the Memorial Hermann facility at 6400 Fannin Street in Houston, Texas. Plaintiff M.S. also used the Website to schedule gastroenterology appointments, a diagnostic colonoscopy and blood work and other testing related to her medical conditions. The medical care she researched and arranged through the Website concerned, among other things, Crohn's disease, polyps, and anemia.

29. Unbeknownst to Plaintiff M.S., on information and belief, Memorial Hermann intercepted the Sensitive Health Information that she communicated in transit while using the Website, including when she researched symptoms, selected medical providers, and scheduled appointments. Memorial Hermann then transmitted Sensitive Health Information from those

communications to third parties, including Google. That information included the types of medical care she sought, the providers and locations she selected, and details of the appointments she scheduled.

30. Plaintiff M.S. never authorized Memorial Hermann to disclose any aspect of her communications with Memorial Hermann through the Website to third parties, including the Sensitive Health Information that she provided to Memorial Hermann. She expected that information to remain confidential.

31. On every occasion that she visited the Website, Plaintiff M.S. possessed an account with Google, and she accessed the Website while logged into her Google account on the same device.

***Defendant***

32. Defendant Memorial Hermann Health System is a nonprofit corporation organized under the laws of Texas, with its principal place of business at 929 Gessner Road, Suite 2700, Houston, Texas 77024.

33. Memorial Hermann operates healthcare facilities in the Houston area.

34. Memorial Hermann owns and maintains www.memorialhermann.org and controls the online scheduling workflow at scheduling.memorialhermann.org, which it makes available to patients and prospective patients.

35. Memorial Hermann deployed or caused the deployment of the Tracking Tools on the Website and configured or caused their configuration to intercept and disclose its users' Sensitive Health Information to third parties, including Google.

## **JURISDICTION AND VENUE**

36. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint asserts a claim for violation of federal law, specifically, the ECPA, 18 U.S.C. §§ 2511 and 2520.

37. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because the state-law claims alleged herein form part of the same case or controversy.

38. This Court has personal jurisdiction over Memorial Hermann Health System because it is incorporated in Texas and maintains its principal place of business in Houston, Texas. Defendant also purposefully directed the challenged Website and its booking functionality to people seeking care in Texas, including through Texas clinic listings and Texas-specific virtual scheduling.

39. Venue is proper in the Southern District of Texas under 28 U.S.C. § 1391(b)(1), (c)(2), and (d) because Memorial Hermann Health System is the sole Defendant and resides in this district for venue purposes. Its principal place of business is in Houston, Harris County, which is in the Houston Division. 28 U.S.C. § 124(b)(2).

## FACTUAL ALLEGATIONS

### A. MEMORIAL HERMANN'S USE OF THIRD-PARTY TRACKING TECHNOLOGIES.

#### i. Google's Mass Advertising Surveillance Operation.

40. In 2023, Google's advertising revenue of approximately $238 billion accounted for about 77 percent of Alphabet's total revenue for the year.[3]

[3] *Alphabet Inc., Annual Report (Form 10-K), at 35 (year ended Dec. 31, 2023), https://abc.xyz/assets/5a/ae/29f710e646b49ee3d6b63c4dc3a0/goog-10-k-2023.pdf (reporting $237.855 billion in Google advertising revenue and $307.394 billion in total Alphabet revenue).*

41. Google advertises that Google Analytics can help website operators understand their site and app users, evaluate marketing performance, and obtain insights from Google.[4]

42. Indeed, on its *Privacy & Terms* page, Google admits that it collects information from third-party websites, stating that "[m]any websites and apps use Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google."[5]

43. Google explains that, when ad personalization is enabled, information collected from websites using its ad services may be used to show users relevant ads on other sites. Google gives the example of a user who visits a site selling mountain bikes and later sees a mountain-bike ad on a different site.[6]

44. Google's general description of its advertising services does not identify the specific appointment fields Memorial Hermann's Website sent to Google Ads.

45. Google Ads allows advertisers to reach audiences using segments based on interests, purchase intent, life events, and certain demographic characteristics.[7]

46. In 2017, Scientific American reported that more than 70 percent of the smartphone apps discussed in its report sent personal data to third-party tracking companies.[8]

---

[4] *Google Marketing Platform, Google Analytics, https://marketingplatform.google.com/about/analytics/.*

[5] Google, How Google Uses Information from Sites or Apps That Use Our Services, https://policies.google.com/technologies/partner-sites.

[6] *Google, How Google Uses Information from Sites or Apps That Use Our Services, https://policies.google.com/technologies/partner-sites (under "Ad personalization").*

[7] *Google Ads Help, About Audience Segments, https://support.google.com/google-ads/answer/2497941.*

[8] *Narseo Vallina-Rodriguez & Srikanth Sundaresan, 7 in 10 Smartphone Apps Share Your Data with Third-Party Services, Scientific American (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/.*

47. Published testing has documented the transmission of information about health-related online activity to advertising and analytics companies. For example:

a. The Markup reported that pharmacy websites sent online tracking data to third parties when users browsed health-related products, including pregnancy tests, HIV tests, and emergency contraception.[9]

b. In a 2019 study of 36 apps for depression or smoking cessation, 29 apps, or 81 percent, transmitted data to advertising, marketing, or analytics services operated by Google or Facebook.[10]

48. In 2010, Google's then-CEO Eric Schmidt said that Google knew where users were and where they had been and could infer what they were thinking about.[11]

49. Google offers its Analytics tools to website operators free of charge.[12]

50. Website operators can use Google's tools to measure user activity and evaluate advertising performance.

51. For example, Google's Analytics platform provides tools to analyze site and app activity and integrates with other Google products.[13]

---

[9] *Darius Tahir & Simon Fondrie-Teitler, Need to Get Plan B or an HIV Test Online? Facebook May Know About It, The Markup (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it.*

[10] *Kit Huckvale, John Torous & Mark E. Larsen, Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation, 2 JAMA Network Open e192542 (2019), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2730782.*

[11] Andrew Orlowski, Google's Schmidt: We Know What You're Thinking, The Register (Oct. 4, 2010), https://www.theregister.com/software/2010/10/04/googles-schmidt-we-know-what-youre-thinking/843272.

[12] *Google Marketing Platform, Google Analytics, https://marketingplatform.google.com/about/analytics/ (describing free analytics tools).*

[13] *Google Marketing Platform, Google Analytics, https://marketingplatform.google.com/about/analytics/ (describing free analytics tools and integrations).*

**ii. Google Ads Conversion Tracking.**

52. Google Ads uses conversion tracking to measure actions on an advertiser's website. Google explains that, when a user converts, the conversion tracking tag can read an advertising cookie and send it to Google Ads with conversion information.[14]

**iii. Pixels Can Record Interactions Between a User and a Website.**

53. Memorial Hermann used Tracking Tools to generate analytics events and Google Ads conversion requests through its Website.

54. Pixels are one of the tools used by website operators to track user behavior. As the Federal Trade Commission ("FTC") explains, a Pixel is:

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews… Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[15]

55. Tracking tools can report particular webpage views and interactions. Published testing, for example, documented pharmacy websites sending information about health-related products users viewed or selected.[16]

---

[14] *Google Ads Help, How Google Ads Tracks Website Conversions, https://support.google.com/google-ads/answer/7521212.*

[15] FTC Office of Technology, *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FTC Technology Blog (March 16, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking.

[16] *Darius Tahir & Simon Fondrie-Teitler, Need to Get Plan B or an HIV Test Online? Facebook May Know About It, The Markup (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it.*

56. But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[17]

**iv. The Tracking Tools Installed on the Website Transmit Health-Related Communications and Browser Identifiers.**

57. Every website is hosted by a computer "server" that holds the website's contents.

58. To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet. Each "client device" (such as computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

59. Communications between a website server and web browser consist of requests and responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information—the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

60. A website server can send a response that instructs the browser to store a small piece of data called a cookie. The browser can send the cookie back with later requests. Cookies

---

[17] FTC Office of Technology, *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FTC Technology Blog (March 16, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking.

can help a site maintain a session, remember language preferences or shopping-cart contents, and distinguish visits.[18]

61. Google Analytics uses a client identifier, commonly stored in a first-party cookie, to recognize a browser or client across visits. Separately, Google Ads uses advertising identifiers, including an identifier labeled "auid," to recognize and associate conversion activity. These identifiers are not interchangeable. Memorial Hermann's Website caused Google Ads conversion requests containing a recurring AUID to be transmitted directly to Google.

62. When Google's tracking code operates on a website, it can cause the browser to send the substance of the user's interactions, the webpages and services selected, browser and device characteristics, and persistent identifiers to Google. Google may combine information received from a website with cookies, advertising identifiers, and information previously associated with the same browser or device. This capacity to correlate communications across visits makes an identifier meaningful even when the particular transmission does not contain the patient's name.

63. Google's advertising technology uses cookies and other persistent identifiers to recognize browsers and devices and to measure advertising conversions. When a person is signed into a Google account, like Plaintiffs were when they communicated with Memorial Hermann's Website, Google uses additional account-related information that can be associated with activity on the same browser or device. The identifying information Google already maintains, in combination with identifiers accompanying the intercepted medical communications, permits Google to recognize the individual associated with those communications.

---

[18] *MDN Web Docs, Using HTTP Cookies, https://developer.mozilla.org/en-US/docs/Web/HTTP/Guides/Cookies.*

64. Specifically, Memorial Hermann's Website caused the browser to send the same auid directly to Google Ads in requests that also disclosed the selected physician, rheumatology specialty, clinic, visit type, and appointment date and time. The identifier enabled Google to associate the medical scheduling details with Plaintiffs. Google can also associate such identifiers with other information it possesses concerning the user, including account information.

65. The Google-bound conversion requests also carried browser and device information, including browser version, operating system, language, and other technical characteristics. Such information alows an advertising platform in recognizing or distinguishing a browser, independently of whether a patient's name appears in a particular request.

66. The combination of persistent advertising identifiers, browser and device characteristics, and health-related event details enables the recipient to correlate a user's medical communications with that user's activity elsewhere. Google maintains data about users and their browsers and can use such information to associate events with identifiable users.

**v. The Website's Scheduling Tools Transmitted Appointment Information to Google Ads.**

67. Plaintiffs and Class Members used Memorial Hermann's Website to research and access health treatments and services related to health care services. While visiting Defendant's Website, Plaintiffs and Class Members each searched for and accessed information regarding available health care services, selected appointment options, and entered or conveyed health-related information—including the type of health care services sought—thereby transmitting protected health information through the Website.

68. Unbeknownst to Plaintiffs and Class Members, Memorial Hermann intentionally configured the Tracking Tools installed on the Website to intercept and then disclose the Sensitive

Health Information and other protected information that they communicated to Memorial Hermann through the Website to third parties, including Google.

69. As Figure 1 shows, when a user schedules an appointment through the Website, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Website includes the user's AUID, as well as their PHI, including that they are scheduling an appointment with a rheumatologist, the location, date, and time of the appointment, and the type of appointment. Specifically, Figure 1 shows that Memorial Hermann transmitted the following: that the patient scheduled and appointment with rheumatologist Jaqueline Vo for a rheumatology consult on February 4, 2027.



Headers Payload Preview Response Initiator Timing Cookies

▾ General

| | |
|---|---|
| Request URL | https://www.googleadservices.com/pagead/conversion/1043455932/?random=1889070196&fst=1794543897819&cv=10&fmt=7&label=DkhZCLyuqvABELy_x_ED&bg=ffffff&guid=ON&u_w=1600&u_h=1067&gtm=45h91e6bb1v880124722z8813472266z9861349698za20kzb813472266zd813472266xf3xg4&auid=830345888.1793980878&rcb=1&dma=0&npa=0&gcd=13l3l3l3l1l1&uaa=x86&uab=64&uafvl=Not-A.Brand%3B99.0.0.0%7CGoogle%2520Chrome%3B157.0.8103.39%7CChromium%3B157.0.8103.39&uamb=0&uam=&uap=Windows&uapv=19.0.0&uaw=0&pscdl=noapi&url=https%3A%2F%2Fscheduling.memorialhermann.org%2Fappointments%2Fnew&ref=https%3A%2F%2Fscheduling.memorialhermann.org%2Fp%2Frheumatologists-dr-jacqueline-vo-md-1346338001&tiba=Booking%20Form&data=event%3Dapp_made_gads%3Bredirect_count%3D0%3Bnavigation_type%3DNAVIGATE%3Btab_type%3DExisting%3Btabs_open%3D1%3Btab_id%3Dc91b5fe6-5e0b-4a44-b9b2-74a9e7c30989%3Bpage_query%3Dslot%3Dhenl5xepqfqjzdp3zyoqcqmxyb7v67qpjuqh8nrhd9sb%26start%3D2027-02-04t10%3A20%3A00-0600%26profile%3D3a9707df-c0ad-41f0-b04f-ffd184c21a05%26visit_type%3D3dbcd19b-e338-42e6-be78-d404bc4073fa%26search%3D%26procedure_name%3Dconsult%2520-%2520rheumatology%26profile_name%3Ddr.%2520jacqueline%2520vo%2C%2520md%3Bpage_referrer_simplified%3Dscheduling.memorialhermann.org%2Fp%2Frheumatologists-dr-jacqueline-vo-md-1346338001%3Bsn_page%3DBooking%3Bsn_appt_time%3D2027-02-04T10%3A20%3A00-0600%3Bsn_appt_time_dlh%3D2027-02-04T10%3A20%3A00-0600%3Bsn_visit_type%3DConsult%20-%20Rheumatology%3Bsn_visit_type_dlh%3DConsult%20-%20Rheumatology%3Bsn_provider%3DDr.%20Jacqueline%20Vo%2C%20MD%3Bsn_provider_dlh%3DDr.%20Jacqueline%20Vo%2C%20MD%3Bsn_location%3DRheumatology%20Center%20of%20Houston%20PLLC%3Bsn_location_dlh%3DRheumatology%20Center%20of%20Houston%20PLLC%3Bcontent_group%3DScheduling%20Engine%3Bsn_provider_specialty%3DRheumatology%3Bsn_provider_specialty_dlh%3DRheumatology%3Bconversion_id%3D1043455932&bttype=purchase&value=0&uip=67.184.176.0&tag_exp=115616985~115938466~115938469~117215454~118897920~118897930~119860443~120213116~120385422~120412526~120420414~120469145~120469153~121246026~121246034~123977303&_tu=RA&gap.sstd=5&gap.gtb=2&gtb=2&s3p=1&_is_sw=0 |
| Request Method | GET |
| Status Code | 200 OK |
| Remote Address | 142.251.41.66:443 |
| Referrer Policy | strict-origin-when-cross-origin |

▾ Response headers

| | |
|---|---|
| Access-Control-Allow-Credentials | true |
| Access-Control-Allow-Origin | https://collect.memorialhermann.org |
| Alt-Svc | h3=":443"; ma=2592000,h3-29=":443"; ma=2592000 |
| Cache-Control | no-cache, must-revalidate |
| Content-Disposition | attachment; filename="f.txt" |
| Content-Encoding | br |
| Content-Length | 1627 |

**Figure 1**. Developer-tools request headers identifying www.googleadservices.com as the recipient of the appointment conversion request, including the encoded medical scheduling data.

70. As Figure 2 shows, the request's decoded payload included the personal identifier auid, the booking-form context, the selected provider and rheumatology specialty, and the appointment location, date and time. The same identifier was transmitted with those details, enabling the recipient to correlate the appointment communication with the patient's identity and other activity associated with that identifier.



× Headers Payload Preview Response Initiator Timing Cookies

| | |
|---|---|
| u_h | 1067 |
| gtm | 45h91e6bb1v880124722z8813472266z9861349698za20kzb813472266zd813472266xf3xg4 |
| auid | 830345888.1793980878 |
| rcb | 1 |
| dma | 0 |
| npa | 0 |
| gcd | 13l3l3l3l1l1 |
| uaa | x86 |
| uab | 64 |
| uafvl | Not-A.Brand;99.0.0.0\|Google%20Chrome;157.0.8103.39\|Chromium;157.0.8103.39 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| pscdl | noapi |
| url | https://scheduling.memorialhermann.org/appointments/new |
| ref | https://scheduling.memorialhermann.org/p/rheumatologists-dr-jacqueline-vo-md-1346338001 |
| tiba | Booking Form |
| data | event=app_made_gads;redirect_count=0;navigation_type=NAVIGATE;tab_type=Existing;tabs_open=1;tab_id=c91b5fe6-5e0b-4a44-b9b2-74a9e7c30989;page_query=slot=henl5xepqfqjzdp3zyoqcqmxyb7v67qpjuqh8nrhd9sb&start=2027-02-04t10:20:00-0600&profile=3a9707df-c0ad-41f0-b04f-ffd184c21a05&visit_type=3dbcd19b-e338-42e6-be78-d404bc4073fa&search=&procedure_name=consult%20-%20rheumatology&profile_name=dr.%20jacqueline%20vo,%20md;page_referrer_simplified=scheduling.memorialhermann.org/p/rheumatologists-dr-jacqueline-vo-md-1346338001;sn_page=Booking;sn_appt_time=2027-02-04T10:20:00-0600;sn_appt_time_dlh=2027-02-04T10:20:00-0600;sn_visit_type=Consult - Rheumatology;sn_visit_type_dlh=Consult - Rheumatology;sn_provider=Dr. Jacqueline Vo, MD;sn_provider_dlh=Dr. Jacqueline Vo, MD;sn_location=Rheumatology Center of Houston PLLC;sn_location_dlh=Rheumatology Center of Houston PLLC;content_group=Scheduling Engine;sn_provider_specialty=Rheumatology;sn_provider_specialty_dlh=Rheumatology;conversion_id=1043455932 |
| bttype | purchase |
| value | 0 |
| uip | 67.184.176.0 |
| tag_exp | 115616985~115938466~115938469~117215454~118897920~118897930~119860443~120213116~120385422~120412526~120420414~120469145~120469153~121246026~121246034~123977303 |
| tu | RA |

**Figure 2**. Developer-tools payload for the direct Google Ads conversion request, showing the auid and the appointment-related data fields.

71. The same appointment details were also included in a request to googleads.g.doubleclick.net/pagead/viewthroughconversion/1043455932/, a Google advertising endpoint. As Figure 3 shows, this was a separate Google-bound browser request.




**Figure 3**. Developer-tools headers for the direct request to googleads.g.doubleclick.net containing the appointment-conversion payload. November 6, 2026 capture.

72. As mentioned above, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Plaintiffs to their identities. The screenshots reproduced above show that the Google Pixel on the Website transmitted the identifier numbers attached to Google's 'auid' cookie, which identifies the user's Google account, along with other information that is commonly used to create a browser fingerprint, such as the user's language selection, screen resolution, IP address, web browser software and version number, and operating system and version number.

73. In their default state, Google's Pixels record and transmit only "automatic events," consisting largely of routine user behavior, such as the URLs visited by internet users. But Memorial Hermann purposely configured the Google Tracking Tools on the Website to collect and transmit additional user data, including information related to users' appointment scheduling activity, and the medical reasons for those appointments that revealed those patients' PHI.

## B. MEMORIAL HERMANN DISCLOSED PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES WITHOUT THEIR KNOWLEDGE OR CONSENT.

### i. Memorial Hermann Failed to Inform Plaintiffs and Class Members of Its Disclosure of Their Sensitive Health Information.

74. Memorial Hermann breached Plaintiffs' and Class Members' right to privacy by unlawfully disclosing their Sensitive Health Information to third parties, including Google.

75. Specifically, Plaintiffs and Class Members had a reasonable expectation of privacy. Memorial Hermann did not inform Plaintiffs and Class Members that it was sharing their Sensitive Health Information with third parties, including Google.

76. Memorial Hermann's public privacy documents discuss cookies, advertising, and the handling of medical information.

77. Memorial Hermann's General Privacy Policy directs patients to its HIPAA Privacy Notice. It also describes the use of cookies and similar technologies to improve the Website and manage advertising.[19]

---

[19] *Memorial Hermann, General Privacy Policy (effective May 6, 2024), https://memorialhermann.org/legal/general-privacy-policy (directing patients to its HIPAA Privacy Notice and separately describing cookies and advertising).*

78. Memorial Hermann's Joint Notice of Privacy describes how the participating entities may use or disclose medical information.

> The Joint Notice also describes patients' rights concerning their medical information and the privacy obligations of the participating entities.[20]

79. Memorial Hermann separately describes how it uses and discloses medical information for marketing.

> Memorial Hermann states that, subject to applicable state and federal law, it will obtain written authorization before using or disclosing medical information for marketing. It also identifies exceptions, including certain face-to-face communications and gifts of nominal value.[21]

80. By engaging in this improper sharing of information without Plaintiffs' and Class Members' consent, Memorial Hermann violated its own Privacy Policy and HIPAA Notice of Privacy Practices, breached Plaintiffs' and Class Members' right to privacy, and unlawfully disclosed their Sensitive Health Information.

81. Despite failing to tell users like Plaintiffs and Class Members or obtain their consent to these disclosures, Memorial Hermann allowed third parties such as Google to acquire their Sensitive Health Information for advertising purposes, on information and belief.

**ii. The Tracking Tools Used by Memorial Hermann Were Imperceptible to Plaintiffs and Class Members.**

82. The Tracking Tools installed on the Website were invisible to Plaintiffs and Class Members. Without analyzing the network information transmitted by the Website through

[20] *Memorial Hermann, Joint Notice of Privacy, https://memorialhermann.org/legal/introduction-privacy/joint-notice-privacy.*

[21] *Memorial Hermann, Uses & Disclosures of Medical Information, https://memorialhermann.org/legal/introduction-privacy/uses-disclosures-medical-information (under "Marketing").*

examination of its source code or the use of sophisticated web developer tools, there was no way for a Website user to discover the presence of the Tracking Tools. As a result, typical internet users such as Plaintiffs and Class Members were unable to detect the Tracking Tools on the Website.

83. Memorial Hermann's public General Privacy Policy discusses cookies and advertising in general terms. Plaintiffs allege that Memorial Hermann did not give users notice that their Sensitive Health Information would be disclosed to an unauthorized third party.

84. Because Plaintiffs and Class Members were not aware of the Tracking Tools on the Website, or that their Sensitive Health Information would be collected and transmitted to Google, they could not and did not consent to Memorial Hermann's conduct.

## C. MEMORIAL HERMANN WAS ENRICHED BY ITS DISCLOSURE OF PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES.

### i. Memorial Hermann Received Material Benefits in Exchange for Plaintiffs' Sensitive Health Information.

85. As explained above, website operators using Google's Business Tools receive access to advertising and marketing analytics services by installing Tracking Tools on their websites.

86. Memorial Hermann, as a user of Google's Business Tools, received benefits in the form of advertising measurement and marketing analytics by allowing Google to collect Plaintiffs' and Class Members' Sensitive Health Information.

### ii. Plaintiffs' and Class Members' Data Had Financial Value.

87. Plaintiffs' and Class Members' Sensitive Health Information has value, and Memorial Hermann's disclosure and interception of that Sensitive Health Information harmed Plaintiffs and the Class.

88. Advertising revenue illustrates the commercial value of information used to measure and deliver advertising. A 2021 Washington Post analysis used Facebook's financial statements to estimate annual advertising revenue per American user at about $19 in 2013 and $164 in 2020.[22]

89. Published valuation literature reports a broad range of historical prices for clinical records and electronic health record databases, including prices above $125 for some clinical records and up to $500,000 for some databases.[23]

90. The unauthorized disclosure of Plaintiffs' and Class Members' private and Sensitive Health Information has diminished the value of that information, resulting in harm to Plaintiffs and Class Members.

**D. MEMORIAL HERMANN'S USE OF THE TRACKING TOOLS VIOLATES HIPAA.**

91. HIPAA's Privacy Rule governs covered entities' use and disclosure of protected health information. HHS notes that its online-tracking guidance was vacated in part as to the combination of an IP address and a visit to certain unauthenticated public webpages.[24]

---

[22] *Geoffrey A. Fowler, There's no escape from Facebook, even if you don't use it, The Washington Post (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/.*

[23] *Todd Zigrang & Jessica Bailey-Wheaton, Valuing Healthcare Data, THE VALUE EXAMINER (2023), available online at: https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf*

[24] *U.S. Department of Health & Human Services, The HIPAA Privacy Rule, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html. See also HHS, Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, https://www.hhs.gov/hipaa/for-*

92. The HIPAA de-identification Safe Harbor identifies 18 categories of identifiers to be removed, subject to an actual-knowledge requirement. Whether information is PHI depends on the health information, its connection to an identifiable individual, and the context in which a regulated entity holds or transmits it.[25]

93. A covered entity's use of third-party tracking tools is subject to the Privacy Rule when the information used or disclosed is PHI.

94. Here, Plaintiffs allege that Memorial Hermann provided Sensitive Health Information to third parties, including Google, and that those disclosures violated the Privacy Rule to the extent they included PHI and lacked authorization or another lawful basis.

95. Subject to the exceptions in the Privacy Rule, a covered entity generally must obtain an individual's authorization to use or disclose PHI for marketing. 45 C.F.R. § 164.508(a)(3).[26]

96. The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

97. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual";

---

*professionals/privacy/guidance/hipaa-online-tracking/index.html (noting partial vacatur concerning an IP address paired with a visit to certain unauthenticated webpages).*

[25] *U.S. Department of Health & Human Services, Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the HIPAA Privacy Rule, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (discussing the Safe Harbor identifiers and the actual-knowledge requirement).*

[26] *45 C.F.R. § 164.508(a)(3), https://www.law.cornell.edu/cfr/text/45/164.508.*

and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

98. Under the HIPAA de-identification rule, health information is not considered individually identifiable under only two circumstances: if, (1) an expert has "determine[d] that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "document[ed] the methods and results of the analysis that justify such determination." Or (2) if all enumerated identifiers of the individual or their family members are removed, including names, medical record numbers, account numbers, device identifiers, device serial numbers, URLs, IP addresses, and "[a]ny other unique identifying number, characteristic, or code," so that the entity does not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514.

99. The HIPAA Privacy Rule requires covered entities to safeguard PHI and limits the uses and disclosures that may be made without authorization. 45 C.F.R. §§ 160.103, 164.502.

100. Even the fact that an individual is receiving a medical service, *i.e.*, is a patient of a particular entity, can be PHI.

101. HHS explains that publicly available identifying information, such as a phone-directory entry, ordinarily does not reveal health information. The same identifier paired with information about treatment at a particular clinic can constitute PHI in the applicable covered-entity context.[27]

---

[27] *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html.

102. HHS's marketing guidance explains that, subject to limited exceptions, a covered entity generally must obtain written authorization to use or disclose PHI for marketing. Its examples distinguish authorized marketing from disclosure to a third party for that party's own purposes.[28]

103. Plaintiffs allege that Memorial Hermann disclosed Plaintiffs' and Class Members' Sensitive Health Information to third parties, including Google, without authorization.

104. Plaintiffs allege that the Tracking Tools allowed Google to acquire Sensitive Health Information communicated through the Website.

105. Plaintiffs rely on the Privacy Rule in support of their allegations about the use and disclosure of Sensitive Health Information.

### E. Plaintiffs' and Class Members' Reasonable Expectation of Privacy.

106. At all times when Plaintiffs and Class Members provided their Sensitive Health Information to Memorial Hermann, they had a reasonable expectation that the information would remain confidential and that Memorial Hermann would not share it with third parties for a commercial purpose unrelated to providing medical care. Personal data privacy and obtaining consent to share Sensitive Health Information were material to Plaintiffs and Class Members.

## LIMITATIONS AND DISCOVERY

107. Under 18 U.S.C. § 2520(e), a civil action under the federal Wiretap Act must be commenced within two years after the claimant first had a reasonable opportunity to discover the violation.

[28] *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html.

108. The Tracking Tools on the Website were invisible to the average website visitor. Through no fault or lack of diligence, Plaintiffs could not reasonably discover Memorial Hermann's alleged interception and disclosure through ordinary use of the Website.

109. Memorial Hermann knew that the Website incorporated the Tracking Tools and, Plaintiffs allege, failed to disclose to users, including Plaintiffs and Class Members, that by using the Website to make appointments or seek medical care or information, their Sensitive Health Information would be disclosed or released to unauthorized third parties, including Google.

110. Any applicable statutes of limitation have been tolled by Memorial Hermann's knowing and active concealment of the incorporation of the Tracking Tools onto the Website. Memorial Hermann had exclusive knowledge that the Website incorporated the Tracking Tools and yet failed to disclose to users, including Plaintiffs and Class Members, that by using the Website to make appointments and search for information regarding Memorial Hermann's health care services, Plaintiffs' and Class Members' Sensitive Health Information would be disclosed or released to unauthorized third parties, including Google.

111. Under the circumstances, Memorial Hermann was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its users' Sensitive Health Information. In fact, to the present, Memorial Hermann has not conceded, acknowledged, or otherwise indicated to its users that they have disclosed or released their Sensitive Health Information to unauthorized third parties. Accordingly, Memorial Hermann is estopped from relying on any statute of limitations. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule. The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Memorial Hermann's conduct would have been November 2026, shortly before the filing of this Complaint.

## CLASS ALLEGATIONS

112. This action is brought by Plaintiffs on their own behalf and on behalf of a proposed Class of all other persons similarly situated under Federal Rule of Civil Procedure 23(b)(3). In the alternative, Plaintiffs seek certification of appropriate common issues under Rule 23(c)(4).

113. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> For the fullest period allowed by law, all persons in the United States who used the Website and whose Sensitive Health Information was disclosed or transmitted through the Tracking Tools to Google or another unauthorized third party.

114. The Texas Class that Plaintiffs seek to represent is defined as follows:

> For the fullest period allowed by law, all persons in the state of Texas who used the Website and whose Sensitive Health Information was disclosed or transmitted through the Tracking Tools to Google or another unauthorized third party.

115. Excluded from the proposed Class are Memorial Hermann, its officers and directors, the judges assigned to this action and members of their immediate families, and persons whose only interactions with the Website were conducted for testing or litigation investigation.

116. Plaintiffs reserve the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

117. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. Memorial Hermann operates hospitals, clinics, and specialty practices throughout the Greater Houston area and makes the Website available to patients and prospective patients. As such, at least 100—and likely many more—patients and other Website users have been impacted by Memorial Hermann's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Memorial Hermann.

118. **Commonality.** Common questions of law or fact arising from Memorial Hermann's conduct exist as to all members of the Class and predominate over questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

a) Whether and to what extent Memorial Hermann had a duty to protect the Sensitive Health Information of Plaintiffs and Class Members;

b) Whether Memorial Hermann had duties not to disclose the Sensitive Health Information of Plaintiffs and Class Members to unauthorized third parties;

c) Whether Memorial Hermann used the Tracking Tools to intercept Plaintiffs' and Class Members' Sensitive Health Information while their communications were in transmission;

d) Whether Memorial Hermann disclosed Plaintiffs' and Class Members' Sensitive Health Information to unauthorized third parties, including Google;

e) Whether Memorial Hermann adequately, promptly, and accurately informed Plaintiffs and Class Members that their Sensitive Health Information would be disclosed to third parties;

f) Whether Memorial Hermann's conduct violated the federal or Texas wiretap statute or the Texas statute governing disclosure of hospital health care information, including whether any statutory exception or defense applies; and

g) Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Memorial Hermann's wrongful conduct.

119. **Typicality.** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Sensitive Health Information, like that of other Class Members, was allegedly compromised as a result of Memorial Hermann's incorporation and use of the Tracking Tools.

120. **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiffs have retained counsel experienced in complex class action litigation and intend to prosecute this action vigorously.

121. **Predominance.** Memorial Hermann engaged in a common course of conduct toward Plaintiffs and Class Members through its incorporation and use of the Tracking Tools to collect and disclose their Sensitive Health Information. The common issues arising from that conduct predominate over questions affecting only individual Class Members. Adjudication of those common issues in a single action has important advantages of judicial economy.

122. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Memorial Hermann. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

123. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because they present common questions, the resolution of which would advance the disposition of this matter, including whether Memorial Hermann owed and breached duties to safeguard Sensitive Health Information, whether it adequately informed users of the disclosures, and whether the Tracking Tools disclosed Sensitive Health Information to unauthorized third parties.

124. Identification of Class Members. Members of the proposed Class can be identified through discovery concerning Website activity, scheduling and other applicable records, tracking configurations, and records of disclosures to third parties.

**COUNT I**
**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2511(1) *et seq.***
**Unauthorized Interception, Use, and Disclosure**
***(On Behalf of Plaintiffs and the Class)***

125. Plaintiffs repeat and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

126. The ECPA protects both sending and receipt of communications.

127. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

128. The transmissions of Plaintiffs' Sensitive Health Information to the Website qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

129. Electronic Communications. The transmissions of Sensitive Health Information between Plaintiffs and Class Members and the Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some]

nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

130. Content. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

131. Interception. The ECPA defines interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents . . . include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

132. Electronic, Mechanical, or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiffs' and Class Members' browsers;

b. Plaintiffs' and Class Members' computing devices;

c. Memorial Hermann's web servers; and

d. The Tracking Tools that Memorial Hermann configured to acquire and transmit the contents of users' communications with the Website.

133. By deploying and configuring the Tracking Tools on the Website, Memorial Hermann intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications during transmission, in violation of 18 U.S.C. § 2511(1)(a), as alleged herein.

134. Specifically, Plaintiffs allege on information and belief that the Tracking Tools acquired the contents of their communications with the Website while they were in transmission and caused their Sensitive Health Information to be disclosed to third parties, including Google.

135. Memorial Hermann's intercepted communications include, but are not limited to, communications to and from Plaintiffs and Class Members regarding their Sensitive Health Information, including information related to health care sought or received.

136. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to third parties, while knowing or having reason to know that such information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Memorial Hermann violated 18 U.S.C. § 2511(1)(c).

137. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Memorial Hermann violated 18 U.S.C. § 2511(1)(d).

138. Unauthorized Purpose. Plaintiffs allege on information and belief that Memorial Hermann configured the Tracking Tools to disclose individually identifiable health information to Google for advertising measurement without patient authorization. Plaintiffs allege that this disclosure was a purpose of the acquisition and violated 42 U.S.C. § 1320d-6 to the extent the information identified Plaintiffs and Class Members.

139. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d).

140. Plaintiffs' allegations concern the separate acquisition of the contents of Plaintiffs' and Class Members' electronic communications by the Tracking Tools. To the extent the party exception applies, Plaintiffs allege that Memorial Hermann acquired those contents for the unlawful purpose alleged herein.

141. Plaintiffs allege on information and belief that Memorial Hermann's acquisition and disclosure of the appointment information was intended to result in its unauthorized disclosure to Google for advertising measurement.

142. Plaintiffs allege on information and belief that Memorial Hermann knowingly disclosed individually identifiable health information concerning Plaintiffs and Class Members to Google without authorization, in violation of 42 U.S.C. § 1320d-6.

143. Plaintiffs and Class Members did not know that Google would receive the contents of their private communications with the Website and did not consent to that acquisition or disclosure.

144. As such, Memorial Hermann cannot viably claim any exception to ECPA liability.

145. Plaintiffs and Class Members allege injury from the unauthorized acquisition and disclosure of the contents of their private health care communications, including loss of privacy and control over that information.

146. Plaintiffs allege on information and belief that Memorial Hermann used the Tracking Tools to measure advertising conversions.

147. Memorial Hermann was not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communication.

148. Plaintiffs and Class Members did not authorize Memorial Hermann to acquire the content of their communications for purposes of invading their privacy via the Tracking Tools.

149. Any purported consent that Memorial Hermann may claim it received from Plaintiffs and Class Members was not valid.

150. Plaintiffs allege that the intended disclosure to Google of individually identifiable health information for advertising measurement was unauthorized and unlawful as set forth above.

151. As a result of Memorial Hermann's violation of the ECPA, Plaintiffs and the Class seek relief available under 18 U.S.C. § 2520, including damages under § 2520(c)(2), punitive damages in appropriate cases, such equitable or declaratory relief as the Court deems appropriate, and reasonable attorneys' fees and costs.

## COUNT II
## Violation of the Texas Wiretap Act
## Tex. Code Crim. Proc. art. 18A.502 and Tex. Penal Code § 16.02
***(On Behalf of Plaintiffs and the Texas Subclass)***

152. Plaintiffs repeat and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

153. Article 18A.502 provides a civil cause of action to a person whose electronic communication is intercepted, disclosed, or used in violation of Chapter 18A of the Texas Code of Criminal Procedure or Chapter 16 of the Texas Penal Code.

154. Plaintiffs and Class Members communicated with Memorial Hermann through the Website about their health and medical care. Their electronic communications conveyed Sensitive Health Information, including the types of medical care sought and the details of their requests for appointments.

155. Memorial Hermann deployed and configured the Tracking Tools to acquire the contents of those communications while in transmission and to transmit those contents to third parties, including Google.

156. The technical allegations above describe an example of how the Tracking Tools disclosed the contents of a scheduling communication to Google. Based on the shared configuration and their use of the Website, Plaintiffs allege that the Tracking Tools operated when they arranged medical care and disclosed the contents of their private communications to Google. Plaintiffs. allege that the Tracking Tools acquired and disclosed their private communications when they used the Website as alleged above.

157. Plaintiffs allege on information and belief that Memorial Hermann intentionally intercepted the contents of those communications through the Tracking Tools or, in the alternative, intentionally procured Google to intercept them, in violation of Tex. Penal Code § 16.02(b)(1). Article 18A.502(1) authorizes suit against a person who solicits another to intercept the communication in violation of the statute.

158. Plaintiffs and Class Members did not give prior consent to that acquisition. To the extent Memorial Hermann purported to consent to Google's acquisition, Plaintiffs allege on information and belief that the acquisition was undertaken to disclose individually identifiable health information without authorization for advertising measurement, an unlawful purpose as alleged above. Tex. Penal Code § 16.02(c)(4)(B).

159. To the extent Memorial Hermann disclosed or used contents obtained through an unlawful interception, Plaintiffs allege on information and belief that it intentionally did so while knowing or being reckless as to whether the contents were obtained through such an interception. Tex. Penal Code § 16.02(b)(2)–(3).

160. As a result, Plaintiffs and Class Members seek actual damages subject to the liquidated damages floor of $100 for each day the violation occurs or $1,000, whichever is higher, punitive damages, and reasonable attorneys' fees and litigation costs under article 18A.502(2).

**COUNT III**
**NEGLIGENCE**
***(On Behalf of Plaintiffs and the Texas Subclass)***

161. Plaintiffs repeat and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

162. Through their use of the Website, Plaintiffs and the Class Members provided Memorial Hermann with their Sensitive Health Information, believing such information would be kept confidential.

163. By collecting and storing this data, Memorial Hermann had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

164. Memorial Hermann negligently failed to take reasonable steps to protect Plaintiffs' and Class Members' Sensitive Health Information from being disclosed to third parties, including Google, without their consent.

165. Memorial Hermann further negligently omitted to inform Plaintiffs and the Class Members that it would use their Sensitive Health Information for marketing purposes, and/or that their Sensitive Health Information would be transmitted to third parties.

166. Memorial Hermann knew, or reasonably should have known, that Plaintiffs and the Class Members would not have provided their Sensitive Health Information to Memorial Hermann had they known that Memorial Hermann intended to use that information for unlawful purposes.

167. As a direct and proximate result, Plaintiffs and the Class Members lost the confidentiality of their Sensitive Health Information when it was acquired and disclosed without their knowledge or consent.

168. Plaintiffs and the Class Members seek damages in an amount to be proved at trial.

**COUNT IV**
**UNJUST ENRICHMENT**
***(On Behalf of Plaintiffs and the Texas Subclass)***

169. Plaintiffs repeat and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

170. Plaintiffs plead this claim in the alternative to their breach of implied contract claim.

171. Plaintiffs and the Class Members conferred a benefit on Memorial Hermann by providing their Sensitive Health Information in exchange for information and services related to health care. Memorial Hermann then used that information for marketing and advertising measurement, as alleged above.

172. Memorial Hermann knew of and accepted that benefit by configuring the Tracking Tools to transmit Sensitive Health Information for advertising measurement.

173. In particular, Memorial Hermann allegedly enriched itself by obtaining advertising and marketing analytics from its use of Plaintiffs' and the Class Members' Sensitive Health Information.

174. Plaintiffs and the Class Members, on the other hand, lost the confidentiality of the Sensitive Health Information used to obtain that benefit.

175. Under the principles of equity and good conscience, Memorial Hermann should not be permitted to retain such benefits obtained by its surreptitious collection and transmission of Plaintiffs' and the Class Members' Sensitive Health Information.

176. If Plaintiffs and the Class Members knew that Memorial Hermann had not reasonably secured their Sensitive Health Information, they would not have agreed to provide their Sensitive Health Information to Memorial Hermann.

177. Plaintiffs and the Class Members seek restitution in the alternative to recovery on

their breach of implied contract claim.

178. As a direct and proximate result of Memorial Hermann's conduct, Plaintiffs and the Class Members have suffered and will continue to suffer injury.

179. Plaintiffs and the Class Members seek restitution of the benefits Memorial Hermann unjustly retained, in an amount to be determined at trial.

**COUNT V**
**BREACH OF IMPLIED CONTRACT**
***(On Behalf of Plaintiffs and the Texas Subclass)***

180. Plaintiffs repeat and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

181. Plaintiffs plead this claim in the alternative to their unjust enrichment claim.

182. When Memorial Hermann invited Plaintiffs and Class Members to provide Sensitive Health Information in exchange for information and services related to health care through its Website and they provided that information, the parties entered into an implied contract pursuant to which Memorial Hermann agreed to safeguard that information and to refrain from disclosing it without consent.

183. Plaintiffs and the Class Members accepted Memorial Hermann's offers and provided their Sensitive Health Information to Memorial Hermann.

184. Plaintiffs and the Class Members would not have entrusted Memorial Hermann with their Sensitive Health Information in the absence of an implied contract between them and Memorial Hermann obligating Memorial Hermann not to disclose Sensitive Health Information without consent.

185. Memorial Hermann breached these implied contracts by disclosing Plaintiffs' and the Class Members' Sensitive Health Information to third parties, including Google, without

consent.

186. As a direct and proximate result of Memorial Hermann's breaches of these implied contracts, Plaintiffs and the Class Members sustained damages as alleged herein.

187. Plaintiffs and the Class Members would not have provided their Sensitive Health Information through the Website had they known their Sensitive Health Information would be disclosed to third parties, including Google.

188. Plaintiffs and the Class Members are entitled to compensatory, consequential, and/or nominal damages as a result of Memorial Hermann's breaches of implied contract.

**COUNT VI**
**UNAUTHORIZED DISCLOSURE OF HOSPITAL HEALTH CARE INFORMATION**
**TEX. HEALTH & SAFETY CODE §§ 241.151(2), 241.152–.153, 241.156**
***(On Behalf of Plaintiffs and the Texas Subclass)***

189. Plaintiffs repeat and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

190. Section 241.152 of the Texas Health and Safety Code prohibits a hospital or its agent or employee from disclosing health care information about a patient without the patient's written authorization, except as authorized by section 241.153.

191. In operating the Website's scheduling workflow and handling the appointment information at issue, Memorial Hermann acted as a hospital or on behalf of a licensed hospital as its agent.

192. Through their use of the Website, Plaintiffs and the Texas Members of the Class provided Memorial Hermann with information to schedule medical care, believing that information would be kept confidential. The recorded appointment information, including the specialty, selected provider, clinic, and appointment date and time, concerned the medical care they arranged. Plaintiffs allege on information and belief that the appointment details, in

combination with the accompanying identifiers, identified the patients whose appointments were disclosed and related to their treatment within the meaning of section 241.151(2).

193. Contrary to its duties as a medical provider, Memorial Hermann deployed and configured the Tracking Tools to disclose Plaintiffs' and the Texas Members' health care information to third parties, including Google. Plaintiffs allege on information and belief that the Tracking Tools disclosed information concerning their respective appointments and medical care, as set forth above.

194. Memorial Hermann made these disclosures without the written authorization of Plaintiffs or the Texas Members of the Class. Plaintiffs allege that the disclosures for advertising conversion measurement were not authorized by any exception in section 241.153.

195. As a direct and proximate result of Memorial Hermann's unauthorized disclosures, Plaintiffs and the Texas Members of the Class lost the confidentiality of their private health care information. Plaintiffs and the Texas Members of the Class seek damages resulting from the release in an amount to be determined at trial under section 241.156(a).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment against Memorial Hermann Health System as follows:

A. An order certifying the Class or appropriate common issues, appointing Plaintiffs as Class Representatives, and appointing their counsel as Class Counsel;

B. An award of all damages available under the claims asserted, including statutory, actual, and punitive damages as permitted by law;

C. An award of attorneys' fees, costs, and litigation expenses as permitted by law;

D. Prejudgment interest as permitted by law; and

E. Such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and the putative Class, hereby demand a trial by jury on all issues so triable.

Dated: November 16, 2026,

Respectfully submitted,

*/s/ Leigh S. Montgomery*
Leigh S. Montgomery
Texas Bar No. 24052214
**ELLZEY KHERKHER SANFORD MONTGOMERY, LLP**
4200 Montrose Boulevard, Suite 200
Houston, Texas 77006
E: service@eksm.com
Tel: (888) 350-393

Matthew J. Langley*
Nicholas C. Coyle*
**ALMEIDA LAW GROUP LLC**
849 W. Webster Ave.
Chicago, Illinois 60614
Tel.: (773) 554-9354
matt@almeidalawgroup.com
nick@almeidalawgroup.com

** Pro Hac Vice Forthcoming*

*Counsel for Plaintiffs and the Putative Class*